**PELTON GRAHAM LLC**
Brent E. Pelton (BP 1055)
Taylor B. Graham (TG 9607)
Kristen E. Boysen (KB 0208)
111 Broadway, Suite 1503
New York, NY 10006
Telephone: (212) 385-9700
www.peltongraham.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBBY MAHADEO,<br><br>                              **Plaintiff,**<br><br>-against-<br><br>**PM PEDIATRICS OF SELDEN, PLLC**<br>**and PM PEDIATRICS MANAGEMENT**<br>**GROUP, LLC, Jointly and Severally,**<br><br>                              **Defendants.** | **COMPLAINT**<br><br>**Jury Trial Demanded** |

     Plaintiff Robby Mahadeo ("Dr. Mahadeo" or "Plaintiff"), by his attorneys, Pelton Graham LLC, as and for his complaint against Defendants, upon personal knowledge as to himself and upon information and belief as to other matters, alleges as follows:

## NATURE OF THE ACTION

     1.    Plaintiff is a former medical director of Defendants' pediatric urgent care center located in Carle Place, New York. Plaintiff brings this action to recover damages arising out of unlawful employment discrimination on the basis of race, color, age, religion and national origin.

1

2.      This action seeks damages for Defendants' violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, 42 U.S.C. § 2000e-2(a)(1), the Age Discrimination in Employment Act of 1967, 29 U.S.C. Sec. 621 *et seq.* ("ADEA") and the New York State Human Rights Law §§ 290 *et seq*. of the New York Executive law ("NYSHRL").

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337 and 1343, and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants' business is located in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

5.      This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

6.      On March 20, 2020, New York Governor Andrew M. Cuomo signed Executive Order 202.8 in an effort to stem the spread of COVID-19, which tolls for thirty (30) days "any specific time limit[s] for the commencement, filing, or service of any legal action, notice, motion or other process or proceeding" under any New York State laws or court procedural rules. The thirty (30)-day tolling period began on March 20, 2020 and continued until April 19, 2020. On April 7, 2020, Governor Cuomo signed Executive Order 202.14, which extended the tolling period to May 7, 2020. Subsequently, on May 7, 2020, Governor Cuomo issued Executive Order 202.28, tolling all statutes of limitations for an additional thirty (30) days through June 6, 2020. On June 6, 2020, Governor Cuomo issued Executive Order 202.38, tolling all statutes of limitations until July 6, 2020. On July 7, 2020, Governor Cuomo issued Executive Order 202.48 tolling all statutes

of limitations until August 5, 2020. On August 5, 2020, Governor Cuomo issued Executive Order 202.55, which tolled all statutes of limitations until September 4, 2020. On September 4, 2020, Governor Cuomo signed Executive Order 202.60, which extended the tolling period an additional thirty (30) days to October 4, 2020. On October 4, 2020, Governor Cuomo issued Executive Order 202.67, which extended the tolling period to November 3, 2020. In total, the Executive Orders set forth herein provided for a toll of two hundred and twenty-eight (228) days.

## THE PARTIES

**Plaintiff:**

7.     Plaintiff Mahadeo was, at all relevant times, an adult individual residing in Queens County, New York.

8.     Plaintiff Mahadeo worked for Defendants as a medical director and experienced numerous instances of discrimination on the basis of race, color, age, religion and national origin from various PM Pediatrics management employees that ultimately led to his termination on November 21, 2019.

**Defendants:**

9.     Defendant PM Pediatrics of Selden, PLLC is an active for-profit professional limited liability company doing business in the State of New York, with its principal place of business located at One Hollow Lane, Suite 301, Lake Success, New York 11042.

10.     Defendant PM Pediatrics Management Group, LLC (together with PM Pediatrics of Selden, PLLC, "PM Pediatrics" or "Defendants") is an active New York limited liability company with its principal place of business located at One Hollow Lane, Suite 301, Lake Success, New York 11042.

11.     Upon information and belief, PM Pediatrics of Selden, PLLC owns, operates and

manages a pediatric urgent care center, doing business as "PM Pediatrics Urgent Care," located at 181 Old Country Road, Carle Place, New York 11514 (hereinafter the "Carle Place Location").

12.     Upon information and belief, PM Pediatrics Management Group, LLC owned, operated and managed the Carle Place Location along with PM Pediatrics of Selden, PLLC.

13.     Upon information and belief, PM Pediatrics of Selden, PLLC is one of numerous companies in the PM Pediatrics Management Group, LLC corporate family.

14.     PM Pediatrics owns, operates and manages numerous pediatric urgent care centers across the United States, including sites in Alaska, California, Connecticut, Florida, Illinois, Maryland, Massachusetts, New Jersey, North Carolina, Pennsylvania, Tennessee, Texas, Virginia and Washington, D.C.

15.     PM Pediatrics owns, operates and manages approximately nineteen (19) sites throughout New York State, including the Carle Place Location.

16.     The PM Pediatrics locations within Dr. Mahadeo's practice group included Carle Place, Syosset, Bayside, Manhasset, Massapequa and Rockville Centre.

17.     Upon information and belief, PM Pediatrics employs hundreds of individuals across all of its locations.

## ADMINISTRATIVE PREREQUISITES TO ACTION

18.     Plaintiff Mahadeo timely filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on September 15, 2020.

19.     On June 15, 2021, the EEOC issued Plaintiff Mahadeo a Notice of Right to Sue, which is annexed hereto, stating that Plaintiff could file an action under Title VII and the ADEA.

20.     Plaintiff has filed this complaint within ninety (90) days after the date on which he received the Notice of Right to Sue.

21.     A copy of Plaintiff's Notice of Right to Sue is annexed hereto as Exhibit "A."

## STATEMENT OF FACTS

22.     Dr. Mahadeo is a fifty-seven (57)-year-old, brown-complexioned man of Guyanese descent who practices Hinduism.

23.     Dr. Mahadeo worked for PM Pediatrics as a medical director of the Carle Place Location from in or around July 2018 through November 21, 2019 (the "Mahadeo Employment Period").

24.     Dr. Mahadeo was initially hired by Dr. Karin Sadow, Senior Vice President of Quality for PM Pediatrics, with whom he shared a longstanding professional relationship, in or around May 2018.

25.     Dr. Mahadeo was hired with a sign-on bonus of twenty-five thousand dollars ($25,000.00) and an annual salary of two hundred and seventy-five thousand dollars ($275,000.00).

26.     Despite the fact that GoHealth Urgent Care, a competitor of PM Pediatrics, had offered Dr. Mahadeo a similar position with a more substantial compensation package, Dr. Mahadeo ultimately decided to work for PM Pediatrics based on assurances from Dr. Sadow and Dr. Jeffrey Schor ("Dr. Schor"), PM Pediatrics' CEO, that his future would be secure at the company and certain information presented during a medical director's meeting that Dr. Mahadeo attended prior to his start date that showed rapid growth and expansion and opportunities for upward mobility.

27.     Throughout the Mahadeo Employment Period, Dr. Mahadeo reported directly to Dr. Sheryl Cohen ("Dr. Cohen"), PM Pediatrics' Regional Medical Director of the Long Island Region, who was later promoted to Vice President of Clinical Operations in or around August

2019. Dr. Cohen is a Jewish female who is approximately in her early forties.

28.     Dr. Cohen did not initially interview Dr. Mahadeo and, upon information and belief, was not involved in the hiring process.

29.     Although Dr. Mahadeo was initially scheduled to work at multiple sites as he familiarized himself with company operations, including Carle Place, Rockville Centre, Massapequa, Syosset, North Babylon, Bensonhurst and Manhasset, Dr. Cohen functioned as Dr. Mahadeo's direct supervisor throughout the Mahadeo Employment Period and routinely made his schedule.

30.     Dr. Mahadeo does not recall receiving an employee handbook describing prohibitions of or methods for reporting unlawful discrimination, harassment and retaliation or attending any training sessions regarding workplace discrimination and/or harassment at any point during his employment with PM Pediatrics.

**PM Pediatrics' Systematic Mistreatment and Termination of Minority Employees**

31.     Through the Mahadeo Employment Period, Dr. Mahadeo witnessed numerous derogatory comments and instances of race, color and national origin discrimination against minority employees at PM Pediatrics that ultimately led to the terminations of several minority individuals.

32.     In or around December 2019, an African American receptionist, Leandra Smith ("Smith"), was terminated based on reports that parents were allegedly complaining about long wait times upon checking into the facility. It is Dr. Mahadeo's understanding that this reason was pretextual, as PM Pediatrics wrongfully attributed weekly summaries of general complaints about the entire facility entirely to Smith, despite the fact that the complaints were not in any way specific to Smith's individual job performance.

33.     Based on the manner in which Smith was treated by then-acting medical director Dr. Elliot Friedman ("Dr. Friedman") and office manager Megan McCaskill ("McCaskill") prior to her termination, as well as certain derogatory, race-based comments from Dr. Cohen regarding Smith's appearance and suitability for the job, it is Dr. Mahadeo's understanding that Smith's termination was a result of a longstanding bias against minority employees at PM Pediatrics.

34.     Throughout Smith's employment at PM Pediatrics, various staff members, including McCaskill and Dr. Friedman, made it exceptionally difficult for Smith to perform her job duties and required far more of her when she requested time off from work due to an emergency than they did of other employees. For example, on one occasion, when Smith requested a day off because her infant was ill, Dr. Friedman and McCaskill required that Smith bring the baby into the facility to prove that the child was sick. Dr. Mahadeo personally examined Smith's baby and confirmed that he was sufficiently ill to warrant Smith's brief absence from work.

35.     As a former medical director, Dr. Mahadeo is aware that when employees called out, the normal procedure was for the medical director on site to call around to other employees who were not on duty to ask whether they were available to come in to assist.

36.     On another occasion, Dr. Shannon Henning ("Dr. Henning"), the medical director of PM Pediatrics' Massapequa and Manhasset facilities, complained to Dr. Mahadeo after Smith requested a short break during a fourteen (14)-hour shift registering patients in or around August 2019. Approximately eight (8) hours into her shift, during which she was unable to use the bathroom or eat a meal, Smith went to the back and asked if someone could cover her so that she could take a ten (10)-minute break. Dr. Mahadeo was initially alerted to the situation by Dr. Henning, who was working at the Carle Place Location that day, via e-mail. Dr. Henning informed Dr. Mahadeo in her e-mail that she felt Smith's request was "rude" and out of line and accused

Smith of not doing her job.

37.     Dr. Mahadeo later spoke with several employees who were present when Smith requested relief. These employees confirmed that Smith's demeanor was calm and nonconfrontational.

38.     McCaskill, who was copied on Dr. Henning's e-mail, also subsequently complained to Dr. Mahadeo that Smith was not doing her work, without providing any specific examples of work that had not been completed, and asked Dr. Mahadeo on several occasions to terminate her, stating that Dr. Cohen "wanted to get rid of" Smith. Dr. Mahadeo replied that it was his opinion that Smith was an excellent employee who had no issues completing her work and often volunteered to take on additional job duties.

39.     It is Dr. Mahadeo's understanding that breaks were typically coordinated with the medical director on the site. Dr. Mahadeo does not recall any complaints or issues with respect to Caucasian employees, who comprised the vast majority of the staff at the Carle Place facility, requesting or taking breaks.

40.     As discussed in greater detail below, while Smith faced stern criticism for requesting a short break during a lengthy shift, certain Caucasian and Jewish employees faced no discipline whatsoever for egregious instances of misconduct.

41.     On another occasion, when Smith arrived at her desk at 12:01 pm for a 12:00 pm shift, Dr. Friedman rushed out from the back and yelled at her that she was late. When Smith, who was rarely late for work, responded that she was already in the building by 12:00 pm, Dr. Friedman sternly responded that she was required to be at her desk at 12:00 pm.

42.     Dr. Mahadeo is aware that at least one Jewish, Caucasian employee, Nurse Practitioner Meirav Siegel ("Siegel"), was never reprimanded for lateness, despite the fact that she

arrived fifteen to thirty (15-30) minutes late for her shift on a frequent basis.

43.     Dr. Mahadeo is aware that a Caucasian X-ray technician, Amanda Machado ("Machado"), who is of Italian descent, faced no discipline of any kind for routinely leaving her shift early without a replacement.

44.     Dr. Mahadeo is additionally aware that Machado faced no discipline of any kind for refusing to perform X-rays while the facility was transitioning to a new system, stating that she did not feel comfortable taking X-rays if physicians were not going to be able to read them. Instead, Dr. Cohen responded by reassuring Machado that she would put Dr. Mahadeo's name on the X-rays and did not reprimand Machado in any way for refusing to perform her core job duties

45.     Dr. Mahadeo additionally witnessed certain discriminatory comments about Smith from Dr. Cohen during his employment with Defendants. In or around May or June 2019, Dr. Cohen stopped into Dr. Mahadeo's office to discuss certain logistical matters related to the Carle Place Location. During this conversation, Dr. Cohen roundly criticized Smith's hair and dress, which were apparently Afrocentric, asking Dr. Mahadeo, "what kind of hairstyle is that?" and commenting that the way Smith dresses and styles her hair "doesn't look good." Dr. Cohen additionally commented that the African styles that Smith wore projected a "bad image" of PM Pediatrics and stated that she did not want Smith working in the front of the facility, as the patients and families who serviced the Carle Place facility were mostly Caucasian. Dr. Cohen also referred to Smith's "ghetto tone" when speaking with parents.

46.     On one occasion, when McCaskill approached me and asked me to terminate Smith, she parroted Dr. Cohen's language about Smith's speaking voice and informed me that Dr. Cohen had stated during a meeting with McCaskill that PM Pediatrics did not want an African American person working up front.

47.     Smith was subsequently terminated on or about December 29, 2019.

48.     In or around June or July 2019, Dr. Cohen approached Dr. Mahadeo and asked him to terminate a Mexican-American medical assistant, Melvin Godinez ("Godinez"), because there were "too many minorities" working at the Carle Place Location, and the patients were mostly white. Dr. Cohen further attempted to bolster her reasoning by stating that the Carle Place Location generates a lot of income and that she wanted to "make sure the patients are happy" by projecting a "better image" of the company, presumably by terminating minority employees. During this conversation, Dr. Cohen specifically referenced Godinez's "Mexican look," stating that his appearance "didn't look good" for Carle Place, and informed Dr. Mahadeo that she had been getting reports from unidentified staff that they did not care for his appearance.

49.     Dr. Mahadeo replied that he believed that Godinez was a strong employee and that Dr. Cohen's conduct and remarks were discriminatory. Dr. Cohen stated that as medical director, Dr. Mahadeo had to listen to what she said and follow her directives.

50.     During the Mahadeo Employment Period, Dr. Mahadeo also received several requests from McCaskill to terminate Godinez based on similar complaints about Godinez's "Mexican" appearance. Notably, Godinez wore scrubs and black safety sneakers, which was typical of the other medical assistants, such that Dr. Cohen and McCaskill's comments regarding Godinez's "Mexican look" could not plausibly be construed to be in reference to the manner in which Godinez dressed for work.

51.     Godinez was ultimately terminated in or around July 2019.

52.     In or around September 2018, PM Pediatrics additionally terminated Generra Green ("Green"), an African American medical assistant, and Athena Sanchez ("Sanchez"), a Guyanese-Puerto Rican medical assistant, despite the fact that Dr. Mahadeo, having frequently worked

alongside them, knew them to be hardworking and was not aware of any prior complaints about their respective job performances.

53.     During his employment with Defendants, Dr. Mahadeo witnessed at least one occasion when McCaskill reacted negatively to Sanchez playing Guyanese music in a staff common area. Sanchez occasionally played Hindi language songs in a common room of the Carle Place Location at a low volume such that patients were not able to hear it. On one occasion, Dr. Mahadeo witnessed McCaskill approach Sanchez to ask her what kind of music she was playing. Sanchez replied that it was Guyanese music, which she danced to in her spare time. McCaskill replied that Dr. Cohen would not like that type of music played at PM Pediatrics and requested that. Sanchez turn it off.

54.     Dr. Mahadeo is aware that Machado frequently played hip hop and house music at a similar volume in the common room without issue.

55.     Dr. Mahadeo additionally witnessed McCaskill issue complaints about the smell of Sanchez's Guyanese food, stating that Dr. Cohen "wouldn't want that here."

56.     On another occasion, McCaskill instructed Sanchez not to display a Guyanese flag on her vehicle, stating, "don't do that nonsense here," despite the fact that Sanchez was parked in the back of the facility, out of patients' view.

57.     On one occasion, Dr. Mahadeo was approached by a Guyanese X-ray technician, Michael Baldeo ("Baldeo"), who informed Dr. Mahadeo that he was aware that many of the other X-ray technicians, including Machado, were earning more than him, despite the fact that he had worked for PM Pediatrics for seven (7) or eight (8) years. When Dr. Mahadeo asked Dr. Cohen whether PM Pediatrics could give Baldeo a raise, Dr. Cohen declined his request, stating that Machado, who had worked for the Company for less than a year, was "better than that Indian boy,"

referring to Baldeo.

58.     Upon information and belief, Baldeo was terminated in or around March 2020.

59.     Dr. Mahadeo is aware that PM Pediatrics took great efforts to terminate Krystal Rivera ("Rivera"), a Hispanic nurse, during the Mahadeo Employment Period, despite the fact that she was a strong employee who often trained other nurses within the company. On one occasion in or around September 2019, McCaskill informed Dr. Mahadeo that Dr. Cohen had instructed her to come up with reasons to "get rid of" Rivera. As an example, Dr. Cohen had suggested that McCaskill change Rivera's schedule such that her workday ended at midnight instead of 10:00 pm in an attempt to force out Rivera, who had a baby at home and would find it difficult to work later hours. When Rivera requested to switch to another facility that offered earlier work shifts, Dr. Cohen denied her request.

60.     In or around summer 2019, Dr. Cohen made additional discriminatory comments about an African American female intern, whose name Dr. Mahadeo cannot recall, who had applied, and been approved, through corporate. When Dr. Cohen observed the intern working at the Syosset facility, she called Dr. Mahadeo and demanded to know who had given her permission to work there. Dr. Mahadeo replied that he did not personally hire her. Dr. Cohen responded that she did not want "this African American girl working there" and asked if there was a way to "get rid of her." Dr. Cohen additionally insisted that it must have been a "mistake" that she got through the company's screening process and informed Dr. Mahadeo that he could decline to work with her if he so chose.

61.     Subsequently, Dr. Cohen circulated a strongly worded e-mail stating that any new hires had to be directly approved by her and embarked on a campaign to minimize the intern's role within the company, including abruptly cutting her hours from five (5) days per week to two (2)

days per week.

62.     Dr. Richard Bruckner ("Dr. Bruckner"), the medical director at PM Pediatrics' Syosset facility, additionally refused to allow the intern to work at his site, stating that patients would be uncomfortable having her in the room, as Syosset primarily served white individuals. Dr. Bruckner is a Caucasian, Jewish male.

63.     Dr. Mahadeo is aware that Brandon Bridgemohan ("Bridgemohan"), a former part-time medical assistant of Indian descent, was never offered a permanent position at PM Pediatrics despite repeated inquiries to McCaskill. Despite the fact that McCaskill routinely responded that there were no positions available, Bridgemohan informed Dr. Mahadeo that PM Pediatrics hired a full-time female Caucasian medical assistant around the time of Smith's termination in or around late 2019.

64.     McCaskill additionally declined to schedule Bridgemohan for any future shifts after he asked for a letter of recommendation from PM Pediatrics. Prior to this, McCaskill had routinely assigned Birdgemohan to undesirable weekend shifts.

65.     Bridgemohan further informed Dr. Mahadeo that McCaskill instructed him while he was being trained that, "according to Sheryl," if a white patient shows up to the site at or very shortly after closing time (i.e., 12:00 am), PM Pediatrics' policy is to admit them, whereas minority patients could be ignored if desired, as "they pay less" than white patients.

66.     Dr. Mahadeo is aware that Raquel Gokool ("Gokool"), a registered nurse of Indian descent worked for PM Pediatrics in an unpaid position and was in training with nurse practitioner Amy McGreevy ("McGreevy") to become a nurse practitioner herself. When Gokool asked McCaskill if she could be considered for a paid position in or around September 2019, McCaskill informed Gokool that there was "no way" she was going to be hired, as the company was

comprised of a predominantly "white crowd" and "did not want brown people." As an example, McCaskill informed Gokool that Dr. Cohen had asked her to file false complaints against Dr. Mahadeo. Gokool left PM Pediatrics in or around late September or early October 2019, after she completed her rotation.

**PM Pediatrics' Demonstrated Preference for Jewish Employees**

PM Pediatrics' Repeated Failure to Discipline Meirav Siegel

67.     On December 25, 2018, Dr. Almas Patankar ("Dr. Patankar"), a physician of Indian descent, and Siegel were on duty as medical providers while Dr. Mahadeo was on vacation. During her shift, Siegel devised a plan to attempt to shut the site down so that she could go home for the Christmas holiday, despite the fact that she is Jewish, by claiming that the site had a strong chemical smell that made it difficult to breathe to the point that she needed to use a nebulizer every ten (10) minutes.

68.     At one point during the shift, Siegel took Dr. Patankar's cell phone, which had been left out in a common area, and began texting Dr. Mahadeo, while pretending to be Dr. Patankar, that the condition of the site was so bad that the staff had to go outside for fresh air every two to three (2-3) minutes to be able to breathe and that someone from corporate should come in to assess for safety.

69.     Dr. Mahadeo immediately went into work to assess the situation. When he arrived, he observed employees taking Christmas photos and did not notice an odor of any kind. Dr. Patankar informed Dr. Mahadeo that while it was possible that the cleaning staff had used too much bleach, she did not think the smell was particularly offensive or dangerous.

70.     Although Siegel was attempting to change patients' rooms and informing them about a chemical smell, patients and their guardians disagreed with her and asked to remain in

14

their original rooms.

71.     Further, several staff members, including Godinez and Josephine Pho ("Pho"), an X-ray technician, informed Dr. Mahadeo that Siegel had told them to lie to Dr. Mahadeo about the safety of the site and corroborate her fictious claim about a potentially harmful chemical smell.

72.     Dr. Patankar additionally confirmed that Siegel had pilfered her phone from the common area, which she had learned when Siegel grabbed the phone out of her hands when she noticed that Dr. Mahadeo had responded to one of her text messages.

73.     Dr. Mahadeo ultimately declared that the site was safe and ordered that it remain open. After he left, Siegel texted him repeatedly, stating that she was asthmatic and struggling to breathe and again insisting that someone from corporate come in to inspect the site. Dr. Mahadeo instructed her to go home.

74.     Dr. Mahadeo immediately called Dr. Cohen to report the incident and, over the course of the next several weeks, had discussions with Dr. Cohen to discuss Siegel's behavior during which he stated that he believed that Siegel should either be terminated or no longer permitted to work at the Carle Place Location. During these conversations, Dr. Cohen instructed Dr. Mahadeo not to discuss the situation with anyone, including Dr. Sadow. Dr. Cohen additionally threatened that Dr. Mahadeo was an "older" employee who could easily be terminated and stated that Siegel, who is in her late twenties or early thirties, is a young, Jewish girl who needs her "protection." Dr. Cohen further stated that she needs to look out for Jewish employees, as that is what is "expected" of her.

75.     Siegel was ultimately never disciplined for this incident and was scheduled to continue to work her normal shifts. Moreover, Siegel was one of the few nurse practitioners at PM Pediatrics who was permitted to work independently at certain sites, including Bensonhurst.

15

76.     Dr. Mahadeo is aware that Dr. Cohen frequently signed Siegel's charts for billing purposes, despite the fact that Dr. Cohen had never directly observed the patients. Dr. Mahadeo routinely refused to sign Siegel's charts for patients he had not personally seen. Although he complained to Dr. Cohen that this improper practice could potentially bring about a malpractice suit, Dr. Cohen simply replied that she "didn't care" and would continue to sign Ms. Siegel's charts.

77.     On another occasion in or around January 2019, Dr. Lisa Thomas ("Dr. Thomas"), a thirty (30)-year-old physician of Indian descent, called Dr. Mahadeo to report that Siegel had been in the breakroom eating dinner for over an hour and had only seen a few patients during her shift. Dr. Thomas additionally sent a photograph of a screen showing the number of patients Siegel had seen that day, which verified this information. Dr. Mahadeo subsequently called Ms. Siegel, who confirmed that she was in the breakroom and had attended very few patients during her shift.

78.     Shortly after this phone call, Dr. Mahadeo reported Siegel's behavior to Dr. Cohen and again informed her that he did not want her to assign Siegel to his site, the Carle Place Location, as she frequently came in late and did not see a high volume of patients. Dr. Cohen responded by warning Dr. Mahadeo that she did not want to hear any more complaints against Siegel. She additionally stated that "this Jewish girl" (referring to Siegel) is a harder worker than "that Indian girl" (presumably referring to Dr. Thomas, who is from India) and outrageously proclaimed that Jewish employees are "smarter and better" than the rest of the staff. Dr. Cohen then instructed Dr. Mahadeo to be sure to document any trivial issues about minority staff members at the Carle Place Location, as the site is one of the most profitable in the network, serving a predominately white population, and PM Pediatrics needs to maintain a certain "image" to please its clients.

16

79.     Siegel was ultimately never disciplined for the above-mentioned incidents.

Despite Reported Incidents of Misconduct, Siegel Was Given a Raise and Bonus Equivalent to That Offered to Dr. Mahadeo and Dr. Patankar

80.     In or around early to mid-December 2018, Siegel had her annual review with Dr. Friedman and Dr. Cohen. Prior to this review, Dr. Mahadeo had several conversations with various staff members, including McCaskill, who informed him that it was their opinion that Siegel was "lazy," frequently came in late and forced other providers to see patients. Certain of these staff members further referred to Siegel as Dr. Cohen's "pet." Dr. Mahadeo is aware, based on these conversations, that Dr. Friedman had called Siegel on at least one occasion to scold her for not performing her job duties while she was working at the Rockville Centre site and that complaints had been issued to Dr. Friedman by other staff about Siegel's poor performance.

81.     Although it was Dr. Mahadeo's understanding that, as medical director, he should have been responsible for giving the review and determining Siegel's bonus and raise, Dr. Friedman informed him that he would take care of it, as he had known Siegel for a longer period of time. Dr. Mahadeo later found out from Dr. Friedman that Siegel received a ten thousand-dollar ($10,000.00) bonus and a ten thousand-dollar ($10,000.00) raise.

82.     Subsequently, in or around May 2019, Dr. Mahadeo reviewed Dr. Patankar's job performance with Dr. Cohen. Dr. Patankar received an excellent evaluation. During the review, Dr. Cohen asked Dr. Mahadeo to leave so that she could discuss Dr. Patankar's bonus and raise in private.

83.     Prior to the meeting, Dr. Cohen had informed Dr. Mahadeo that there was a range of possible bonuses and raises to which the company referred when making decisions about wage increases and that she would send him the information so that they could discuss prior to the meeting. Although it is Dr. Mahadeo's understanding that medical directors should be responsible

17

for making decisions about bonuses and raises, Dr. Cohen never sent him the information regarding possible ranges and did not tell him how much Dr. Patankar would be issued prior to asking me to leave the room.

84.     Dr. Mahadeo later learned from Dr. Patankar that she received a ten thousand-dollar ($10,000.00) bonus and a ten thousand-dollar ($10,000.00) raise, the same as Siegel, a nurse practitioner. It is Dr. Mahadeo's belief that Dr. Cohen asked him to leave the room, as she did not want him to know that Dr. Patankar was receiving the same bonus and raise as Siegel despite the substantial complaints that he and others had raised against her. Because Dr. Patankar is a physician, Dr. Mahadeo additionally understood that she should be earning more than a nurse practitioner based on professional hierarchy.

85.     Dr. Mahadeo later discussed Siegel's bonus and raise with Dr. Cohen, arguing that Dr. Patankar should have received a higher bonus and raise than Siegel, as Dr. Patankar is hardworking and well-liked by parents and patients, and because she is a physician who has significantly more training than Siegel. Dr. Cohen again simply stated that she needs to "help the Jewish people."

86.     Several months later, in or around July 2019, Dr. Mahadeo had his annual review with Dr. Cohen, which was extremely positive. During this meeting, Dr. Cohen informed Dr. Mahadeo that his work was excellent and that the staff "loved" him and promised him a ten thousand-dollar ($10,000.00) bonus and a ten thousand-dollar ($10,000.00) raise.

87.     Dr. Mahadeo replied that this was unfair as Siegel, a nurse practitioner, and Dr. Patankar, a junior physician, had received the same. Although Dr. Cohen initially agreed to increase Dr. Mahadeo's bonus to twelve thousand dollars ($12,000.00), she later reneged her promise, informing him that his twenty-five thousand-dollar ($25,000.00) sign-on bonus would be

counted as his annual bonus, such that he would not receive an additional bonus of any kind.

Dr. Cohen's Husband, Joseph Cohen Received Favorable Treatment from PM Pediatrics

88.     On December 6, 2019, Dr. Mahadeo had a conversation with Dr. Yvonne Zrake ("Dr. Zrake"), another PM Pediatrics physician, about certain of Dr. Mahadeo's experiences working for the company, which he recorded.

89.     During Dr. Mahadeo's December 6, 2019 conversation with Dr. Zrake, Dr. Mahadeo and Dr. Zrake discussed the fact that physicians were often left to attend their respective sites without a nurse despite a high volume of patients. Dr. Mahadeo mentioned that Dr. Thomas had recently written a letter to him and Dr. Bruckner stating that she felt unsafe working without assistance and that she had recently had to tend to a child undergoing a seizure without support. During this conversation, Dr. Mahadeo informed Dr. Zrake that he wrote an e-mail to Dr. Cohen stating that he felt it was unfair that PM Pediatrics' Massapequa location routinely staffed physicians and nurse practitioners and/or physicians assistants simultaneously such that physicians are rarely, if ever, left alone, despite the fact that the patient volume at the Carle Place Location is significantly higher.

90.     During this conversation, Dr. Zrake suggested that PM Pediatrics may opt for double coverage at the Massapequa site because Dr. Joseph Cohen, who works as a physician for PM Pediatrics, works at that location and "doesn't know how to do everything," including X-rays, orthopedics and minor wound care. Dr. Zrake further stated that Cyd Greco ("Greco"), a nurse practitioner, is regularly scheduled to work when Dr. Joseph Cohen is on duty and that Greco is the "only nurse practitioner who gets twelve (12)-hour shifts," presumably to provide Dr. Joseph Cohen with additional assistance not afforded to other providers such as Dr. Mahadeo and Dr. Zrake.

91.     During Dr. Mahadeo's December 6, 2019 conversation with Dr. Zrake, Dr. Zrake stated that Dr. Joseph Cohen "gets away with murder," that a high-ranking physician assistant in the company routinely "does all the work when she works with him" and that she "doesn't understand how [Dr. Joseph Cohen] can be a primary." Dr. Mahadeo agreed that the "whole site complains about him," including ancillary staff. Dr. Zrake stated that she would be upset if Dr. Joseph Cohen rose up in the company, to which Dr. Mahadeo responded that he believed that PM Pediatrics would likely find a role for him. Dr. Zrake agreed and pointed out that Dr. Friedman had been promoted and was now "something big in corporate." Dr. Mahadeo informed Dr. Zrake that he believed Dr. Friedman was "in charge of manuals" and told her that he believed that the company was not "going to let go of him" because he is Jewish. Dr. Zrake agreed.

92.     During Dr. Mahadeo's December 6, 2019 conversation with Dr. Zrake, Dr. Mahadeo informed Dr. Zrake that he felt his termination had been discriminatory and that Jewish employees had been "climbing" within PM Pediatrics. Dr. Zrake agreed, stating, "I know. The whole company is Jewish. It's just not fair."

Dr. Richard Bruckner Was Promoted to Regional Medical Director Over Dr. Mahadeo Despite Complaints of Harassment from Other Employees

93.     In or around June or July 2019, Dr. Mahadeo became aware that McGreevy, and a female physician, Jessica O'Mara ("Dr. O'Mara"), had complained about overall harassment, including sexual harassment, from Dr. Bruckner, stating that they preferred to work with Dr. Mahadeo in Carle Place, where they felt more comfortable. When Dr. Mahadeo spoke to Dr. Cohen about the reports of harassment, she instructed him not to tell anyone, especially Dr. Sadow.

94.     Shortly thereafter, in or around August 2019, Dr. Cohen was promoted to Vice President of Clinical Operations for PM Pediatrics in the Northeast and Alaska, despite the numerous discriminatory comments and actions against minority and non-Jewish employees

20

outlined above.

95.     Very shortly before Dr. Cohen announced her promotion, Dr. Mahadeo prepared a self-review as part of his annual review in July 2019, in which he specifically stated that he would like to further assist Dr. Cohen in any way that she felt was appropriate, described his extensive humanitarian work and explained the ways in which he could help to grow the company financially, as he had grown his own medical practice over the past twenty (20) years.

96.     After Dr. Mahadeo realized that Dr. Cohen had been promoted, he asked her directly if he could assist her as a regional medical director. Dr. Cohen replied that she would discuss it with him at a later date.

97.     Subsequently, Dr. Cohen promoted two (2) younger Jewish employees, Dr. Bruckner and Dr. Devin Grossman ("Dr. Grossman"), Jewish, Caucasian men who were both approximately forty (40) years old at the time, as Regional Medical Director for Western Long Island and Regional Medical Director for Eastern Long Island, respectively. Dr. Cohen had exclusively created both of those positions as a direct result of her promotion and simply appointed Drs. Bruckner and Grossman without any form of interview process or formal companywide announcement of their respective appointments.

98.     Later in August, Dr. Cohen informed Dr. Mahadeo that she was appointing Drs. Buckner and Grossman as regional medical directors. Dr. Mahadeo responded that Dr. Bruckner was not qualified for the position and that Dr. Mahadeo had been practicing medicine since 1990 and was far more experienced than either of them. Dr. Mahadeo additionally informed Dr. Cohen that he believed that these individuals were promoted because they are Jewish and stated that she never addressed the sexual harassment allegations against Dr. Bruckner. Dr. Cohen replied that it is her decision who to hire and that she can do whatever she pleases, as the CEO, Dr. Schor, listens

21

to her.

99.     On or about October 17, 2019, Dr. Bruckner came in to relieve Dr. Mahadeo when he was working a noon-to-midnight shift. When Dr. Bruckner arrived, he and Dr. Mahadeo had a conversation during which Dr. Mahadeo confided that he felt that he was being targeted due to his age, religion and race and informed Dr. Bruckner that he feared that PM Pediatrics was going to wrongfully terminate him because of these protected characteristics. Dr. Bruckner openly joked that he is a "Jewish boy and has it made." As discussed in greater detail below, Dr. Bruckner further stated that PM Pediatrics wants "younger people" and that his age and religion are helping him to advance within PM Pediatrics.

100.    It is Dr. Mahadeo's belief that he was denied a promotion to regional medical director due to PM Pediatrics' strong preference for Jewish employees. Although he never engaged in discussions with Dr. Cohen about specific salary amounts, Dr. Mahadeo is confident that the promotion to the regional medical director position would have resulted in a significant salary increase, as he would have been in charge of all six (6) medical directors in the practice group (i.e., Carle Place, Syosset, Bayside, Manhasset, Massapequa and Rockville Centre).

101.    During Dr. Mahadeo's December 6, 2019 conversation with Dr. Zrake, Dr. Zrake remarked that PM Pediatrics "made Rich [Bruckner] in charge so quickly," stating that she doesn't know "how he rose up." Dr. Mahadeo replied that he believed he was promoted because he is Jewish. Dr. Zrake responded that she had worked for PM Pediatrics longer than Dr. Bruckner, who had just started working with PM Pediatrics the previous year.

**PM Pediatrics Discriminated Against Dr. Mahadeo and Other Employees Due to Age**

102.    Dr. Mahadeo is currently fifty-seven (57) years old and was fifty-five (55) years old at the time that the events described in this Complaint took place.

103.     Throughout the Mahadeo Employment Period, Dr. Mahadeo witnessed numerous discriminatory comments about PM Pediatrics' preference for younger workers and seeming animosity towards employees above fifty (50) years of age and was denied a second position and ultimately terminated as a result of the company's drive to push out older employees.

Dr. Cohen and Other PM Pediatrics Employees Made Numerous Antagonistic Comments About Employees' Ages That Reflected a Companywide Pattern of Age-Related Biases and Discrimination

104.     In or around November 2018, Dr. Thomas, who was approximately thirty (30) years old, invited Dr. Mahadeo to have a drink after work. When Dr. Cohen found out about the meeting, she immediately instructed Dr. Mahadeo not to fraternize with Dr. Thomas or any of the medical assistants, as in her opinion, they were "too young" for him.

105.     In or around December 2018, Dr. Zrake, who was approximately sixty (60) years old, asked Dr. Mahadeo if she could be his assistant medical director. Dr. Mahadeo had known Dr. Zrake for approximately twenty-five (25) years and believed her to be an excellent employee and clinician. When Dr. Mahadeo asked Dr. Cohen whether Dr. Zrake could assist him, Dr. Cohen declined, openly stating that Dr. Zrake was "too old" for the position and that the "company wants younger employees."

106.     Throughout the Mahadeo Employment Period, Dr. Cohen additionally made numerous inappropriate and discriminatory comments about other employees' ages and their suitability for employment at PM Pediatrics. In or around April 2019, Dr. Cohen informed Dr. Mahadeo that she had heard rumors that Dr. Alla Shenkman ("Dr. Shenkman"), one of the founders of PM Pediatrics who was in her fifties, was leaving the company to her age. Dr. Cohen remarked that she agreed with Dr. Shenkman's rumored decision to resign, as "she's older now" and has "put in her time."

107.    After Dr. Cohen announced to Dr. Mahadeo that she had promoted Drs. Bruckner and Grossman to regional medical director positions in or around August 2019, Dr. Mahadeo informed her that he thought she should have considered Dr. Debbie Levine ("Dr. Levine"), the medical director of the Manhasset location, who was approximately fifty-five (55) years old, for either of the positions. Dr. Cohen swiftly denied my suggestion and responded that she did not want Dr. Levine in the position because "her career is over" due to her age.

108.    On another occasion in or around early September 2019, after a quarterly seminar, Dr. Mahadeo again stated to Dr. Cohen that he believed that Dr. Levine should have been promoted to a regional medical director position. Dr. Cohen replied that Dr. Levine's "career is over," that she is "over the hill" and that she was "not going anywhere in [PM Pediatrics]."

109.    On numerous occasions, Dr. Levine additionally informed Dr. Mahadeo that she felt that PM Pediatrics was trying to push her out by failing to provide her with extra support when she complained about a high volume of patients and a sparse, slow staff, such that she was required to be available to work on a constant basis. Specifically, Dr. Levine commented that she felt she came into PM Pediatrics too late in her career, as it seemed to her that the company was favoring younger employees.

110.    Dr. Levine ultimately resigned in or around November 2019 and was replaced by Dr. Henning, who was approximately thirty-nine (39) years old and had previously worked very closely with Dr. Cohen.

111.    On another occasion in or around September 2019, Dr. Mahadeo went in to help Dr. Friedman attend to a large surge of patients when he was working alone. During a subsequent conversation with Dr. Cohen, when Dr. Mahadeo mentioned that he had gone in because Dr. Friedman had requested his assistance, Dr. Cohen replied that Dr. Friedman is working slower

because "he is fifty-seven (57) years old and needs to resign and go play with his grandchildren."

112.    strongly encouraged Sookram to apply for a job at PM Pediatrics, stating "the company wants younger providers only."

113.    In or around September 2020, Dr. Mahadeo additionally had a discussion with Dr. Nora Wecker ("Dr. Wecker"), a fifty (50)-year-old former PM Pediatrics physician, which he recorded, during which Dr. Wecker expressed that PM Pediatrics "seems to cater to a young crowd" and prefers younger employees who do not have the experience to push back against practices that they might find unethical or unsafe with respect to the practice of medicine, citing the fact that the company seemed to be keeping a "base" of young MDs and inexperienced nurse practitioners and physicians assistants on staff. Dr. Wecker further expressed that it is her belief that the company "does not want people coming in with their own ideas about best medical practice," and that PM Pediatrics prefers younger employees, as they want to be able to tell their employees "what to do and how to do it" without being questioned.

114.    During Dr. Mahadeo's September 2020 conversation with Dr. Wecker, Dr. Wecker additionally questioned how PM Pediatrics could claim that her termination was due to financial reasons when Dr. Cohen's husband, Dr. Joseph Cohen, who primarily worked out of the facility's Massapequa site, remained employed, despite the fact that he likely earned a much higher salary than she did and either refused, or was not able to, perform a number of procedures.

Dr. Mahadeo Was Wrongfully Denied a Medical Director Position at PM Pediatrics' Bellerose Site and a Regional Medical Director Position Due to His Age

115.    In or around April 2019, Dr. Mahadeo attended a meeting in Syosset with Dr. Cohen and McCaskill. During this meeting, Dr. Mahadeo asked Dr. Cohen if he could become the medical director for a second site that was opening in Bellerose, which was very close to his home. Dr. Cohen bluntly denied his request, simply stating that "the company wants younger people."

116.    Dr. Mahadeo is currently in possession of a recording of a November 22, 2019 conversation between him and McCaskill during which McCaskill agreed that Dr. Cohen stated that the "company wants younger people" during the April 2019 Syosset meeting.

117.    As discussed below, Dr. Mahadeo later discovered that Dr. Cohen had been promising the Bellerose medical director position to Dr. Ahmed Elbedewy ("Dr. Elbedewy"), who was approximately thirty-five (35) years old and had no prior experience in a medical leadership role.

118.    Although Dr. Mahadeo did not discuss specific salary amounts with Dr. Cohen with respect to the Bellerose medical director position, upon information and belief, the position would have resulted in a salary increase, as he would have been responsible for an entire second site in addition to the Carle Place Location.

119.    As mentioned above, in or around August 2019, Dr. Cohen informed Dr. Mahadeo that she was appointing Drs. Bruckner and Grossman, who were both approximately forty (40) years old, to regional medical director positions, despite the fact that Dr. Mahadeo had asked on at least two (2) occasions about assisting Dr. Cohen as a regional medical director. During this conversation, Dr. Cohen specifically informed Dr. Mahadeo that Drs. Bruckner and Grossman are younger, and "that's what the company wants."

**PM Pediatrics' Efforts to Generate False Complaints Against Dr. Mahadeo**

120.    In or around October 2019, Dr. Elbedewy filed a vague and false complaint against Dr. Mahadeo, stating that certain physicians did not complete checking lab results under Dr. Mahadeo's watch during a time when the company was switching to a new Electronic Medical Records ("EMR") system. In the complaint, which Dr. Mahadeo read, Dr. Elbedewy specifically stated that Dr. Bruckner had asked him to file it.

121.     The subject matter of Dr. Elbewey's complaint would have applied to all sites, not just Carle Place, as the issue with lab results not coming in properly was a companywide issue resulting from the transition to a new EMR system, such that anybody who worked that particular day would have had the same issue.

122.     During a subsequent conversation in which Dr. Mahadeo advised Dr. Elbedewy to speak with him first before going over his head to report any perceived issues with his job performance, Dr. Elbewey told Dr. Mahadeo that he felt badly about filing the complaint but only did so because Dr. Bruckner had asked him to file it, stating that Dr. Cohen would make him medical director of the Bellerose site if he did. Dr. Elbedewy then informed Dr. Mahadeo that he specifically indicated in his complaint that Dr. Bruckner had instructed him to file it.

123.     During a subsequent meeting at which all six (6) medical directors and Dr. Cohen were present, Dr. Mahadeo informed Dr. Cohen that Dr. Elbedewy's complaint was completely untrue. Dr. Cohen acknowledged that the complaint was invalid and stated that she also routinely has complaints filed against her and that the CEO, Dr. Schor, simply ignores them and forwards them directly to her. Specifically, Dr. Cohen mentioned during this meeting that although staff members had complained about her appointment of Drs. Bruckner and Grossman to regional medical director positions, as they believed them to be inexperienced and unqualified, it was ultimately her decision who to appoint, and Dr. Schor uniformly ignored all complaints that he received in reference to Dr. Cohen. It is Dr. Mahadeo's belief that Dr. Cohen's implication was that any complaints about her to a higher level of management would go unaddressed.

124.     Dr. Mahadeo is currently in possession of certain April 27, 2020 text messages between him and Dr. Zrake in which Dr. Zrake informed him that "Ahmed told [Dr. Zrake], Rich Bruckner told him to file that complaint" (i.e., Dr. Elbedewy's false complaint against Dr.

Mahadeo regarding lab results). Dr. Zrake further stated, "I think [Dr. Elbedewy] felt bad about doing it. But he was promised to be a medical director."

125.    On or about September 29, 2020, Dr. Zrake texted Dr. Mahadeo to inform him that Dr. Elbewy had been promoted to assistant medical director of PM Pediatrics' Rockville Center site. Dr. Zrake expressed frustration that Dr. Elbedewy had been promoted, as she had requested to be Dr. Mahadeo's assistant medical director at Carle Place and, as mentioned herein, was denied that opportunity because of her age.

126.    In or around mid-October 2019, Dr. Bruckner informed Dr. Mahadeo that a medical assistant, Rachael Fasano ("Fasano") had complained to him that Dr. Mahadeo had "shouted" at her in an unprofessional manner on or about October 10, 2019. It is Dr. Mahadeo's understanding that Fasano exaggerated an instance, per Dr. Cohen's instructions to generate false complaints, during which Dr. Mahadeo explained to Fasano, without raising his voice, that she is not permitted to turn patients away from the facility during periods of long wait time without the approval of a physician on duty, as doing so would constitute an illegal unsafe transfer that could lead to liability for PM Pediatrics. During this interaction, Dr. Mahadeo simply explained to Fasano that as medical director, he believed that it was wrong to send potential patients to other sites without informing the on-site physician, as Dr. Mahadeo was not able to thoroughly medically assess a potential patient from home, and it was often necessary to send patients from PM Pediatrics to the emergency room by ambulance if their physical state was sufficiently critical. Dr. Mahadeo is also aware that many hospital emergency rooms have written policies stating that the facility is not to turn patients away for any reason. In fact, Dr. Mahadeo and McCaskill had spoken with Fasano and other staff members about this specific policy approximately four (4) days prior to the incident described in Fasano's complaint.

127.    Although Fasano additionally complained that the parent of a patient exited an exam room to complain that he had overheard yelling and arguing during her exchange with Dr. Mahadeo, it is Dr. Mahadeo's recollection that the parent came out of the room as his child was in the process of being discharged from the facility such that he was simply seeking discharge paperwork.

128.    Dr. Mahadeo is currently in possession of an October 16, 2019 recording from Dr. Patankar during which Dr. Patankar stated that it if anyone from PM Pediatrics asked her about the incident during which Fasano accused him of speaking to her unprofessionally, she would inform them that it "didn't seem as though he was attacking any one of us." Dr. Patankar further stated that Ms. Fasano may have misinterpreted Dr. Mahadeo's tone because "he was talking really fast" and went on to explain that "I think that's just how we Indians talk. We use our hands to speak… But I did not feel in any shape or form that he was attacking any one of us or…talking to us in a condescending tone. …I think if anything, he was just trying to look out for us."

129.    Upon information and belief, Fasano additionally complained that Dr. Mahadeo failed to respond to a phone call and a text message from her on October 10, 2019 through which she apparently attempted to request permission to send patients to different sites during a period of high volume. Dr. Mahadeo did not respond to Ms. Fasano's phone call or text message, as at the time of her communications, he had already been in touch with Dr. Patankar, the provider on duty, to indicate that he was on his way to the site. Dr. Patankar later contacted Dr. Mahadeo and instructed him to turn around and go back home, as the site had quieted down.

130.    While Defendants produced additional complaints from scribe Keisha McPhoy ("McPhoy") and Machado outlining the events of that evening and the following shift, these complaints contained similar exaggerations, falsehoods and/or misinterpretations of Dr.

Mahadeo's behavior and the circumstances. Notably, these complaints, or any others, were never shared with Dr. Mahadeo during his employment at PM Pediatrics.

131.    On or about October 15, 2019, Fasano made a second false complaint against Dr. Mahadeo, stating that he did not properly care for a supposedly asthmatic patient who, upon examination, did not appear to be in any distress. Dr. Mahadeo had specifically rushed the child to the back to examine him once Fasano called from the front to inform him that there was an asthmatic patient on the way in an effort to avoid any further complains from Fasano. After performing a thorough examination and speaking with the child's parents, Dr. Mahadeo determined that the child was well.

132.    It is Dr. Mahadeo's belief that Fasano and others were encouraged by Dr. Cohen to file complaints against him in an effort to gather non-discriminatory reasons for his termination.

133.    The next day, October 16, 2019, Dr. Mahadeo e-mailed Dr. Bruckner to inform him that Fasano's complaint was fabricated and that he feared another false complaint, as he was scheduled to work with Fasano that night.

134.    As mentioned above, on or about October 17, 2019, Dr. Bruckner came in to relieve Dr. Mahadeo at approximately 8:00 pm, despite the fact that he was scheduled to work until midnight that shift. Dr. Mahadeo again informed Dr. Bruckner that he felt that false complaints were being generated against him in an effort to drive him out because of his age, religion and race. Dr. Bruckner ultimately agreed that Dr. Cohen prefers younger, Jewish employees and that that "seems to be where the company is headed," citing his and Dr. Grossman's recent promotions to regional medical director roles. Dr. Mahadeo asked Dr. Bruckner if he thought he was being terminated, to which Dr. Bruckner replied that he believed that he was, as Dr. Cohen had informed him that Dr. Mahadeo's career was "done" because of his age.

135.    Earlier on October 17, 2019, Dr. Mahadeo had a conversation about the incidents alleged by Fasano with Dr. Sadow during which he agreed that he and McCaskill and could speak to Fasano without her intervention. Dr. Mahadeo also participated in a discussion with Sabrina Parrino ("Parrino"), a PM Pediatrics regional office manager (NY South), McCaskill and Fasano on or about October 21, 2019 to discuss these issues. During this meeting, Fasano and Dr. Mahadeo were cordial and agreed to continue working together professionally. It was Dr. Mahadeo's understanding that the issue had been resolved.

136.    Prior to the filing of these complaints, Dr. Mahadeo and Fasano had shared a pleasant personal and professional relationship. For example, when Fasano confided in Dr. Mahadeo that she had been diagnosed with breast cancer, Dr. Mahadeo sent her flowers and told her that he would accommodate her in any way that she needed, including time off from work. Prior to the complaint, Ms. Fasano had additionally brought food for Dr. Mahadeo on a regular basis and invited him to her home for drinks. When Fasano received three (3) positive patient reviews in a row, Dr. Mahadeo asked McCaskill to buy Fasano a gift to thank her for her good work.

137.    Throughout the Mahadeo Employment Period, Dr. Mahadeo made multiple attempts to schedule an appointment with Dr. Schor, PM Pediatrics' CEO, to discuss issues related to race, religion and age-based "harassment" within the company. Although Dr. Schor agreed that they could speak on several occasions, he ultimately never met with Dr. Mahadeo despite repeated requests.

138.    On November 21, 2019, Dr. Cohen walked Dr. Mahadeo into the office of general counsel for PM Pediatrics, David J. Biehl, and terminated him, stating that he was being let go because "an employee was unhappy" with him.

139.    Based on Dr. Mahadeo's experiences working for PM Pediatrics as outlined above, it is Dr. Mahadeo's belief that this reason is entirely pretextual and/or based on false complaints prompted by Dr. Cohen or others in upper management in a concerted effort to drive him out due to his age, religion, race, color and national origin.

140.    Dr. Mahadeo was ultimately replaced by Dr. Carolyne Jean-Phillipe ("Dr. Jean-Phillipe"), who was approximately thirty-nine (39) years old, thus rendering the entire leadership chain of the six (6) sites in Dr. Mahadeo's practice group approximately forty (40) years old or younger.

141.    Although Dr. Jean-Phillipe, who oversees the Carle Place and Rockville Centre sites, is African American, the remaining medical directors in the group (i.e., Dr. Henning, the medical director of Manhasset and Massapequa, Dr. Bruckner, medical director of Syosset and Regional Medical Director of the Western Long Island Region and Dr. Nicole Porti, medical director of Bayside) and Dr. Cohen are Caucasian.

**PM Pediatrics Cannot Point to Poor Job Performance as a Reason for Dr. Mahadeo's Termination**

142.    As a double-board certified physician in pediatrics and pediatric emergency medicine, Dr. Mahadeo was a valuable asset to PM Pediatrics who brought an exceptional amount of knowledge and experience to the position.

143.    Prior to Dr. Cohen's campaign to generate false complaints against Dr. Mahadeo towards the end of the Mahadeo Employment Period, Dr. Mahadeo had never been written up, informed of any performance issues, placed on a development plan or reprimanded in any manner during his employment at PM Pediatrics and had always met or exceeded the company's standards.

144.    Although Dr. Mahadeo was in the midst of a divorce at the time of his termination, his personal life did not negatively influence his job performance at PM Pediatrics. Dr. Mahadeo's

divorce was never mentioned as a reason for his termination or during the lead-up to his termination. Further, Dr. Mahadeo's divorce commenced in January 2015, nearly five (5) years before he was terminated.

145.     During a happy hour after a quarterly meeting in or around September 2019, Dr. Cohen joked that "half the company is going through a divorce" while speaking about other employees at PM Pediatrics who happened to be in the midst of a divorce at that time. At the time of this conversation, Dr. Mahadeo had not directly mentioned anything about his own divorce to Dr. Cohen, and Dr. Cohen made this remark completely unprompted by anything that Dr. Mahadeo had said or done.

146.     At no point during the Mahadeo Employment Period did Dr. Mahadeo directly approach anyone at PM Pediatrics to initiate a conversation about his divorce or express an interest in publicizing the details of his divorce. During the Mahadeo Employment Period, Dr. Mahadeo generally kept the details of his divorce private and only discussed them with McCaskill, to the extent that he needed assistance rearranging his schedule due to upcoming court appearances, and Dr. Levine, who expressed an interest in working with Dr. Mahadeo on a research project regarding whether children whose parents were undergoing a divorce were susceptible to various forms of child abuse by their parents or others as a direct result of the divorce proceedings. Dr. Levine, who had previously done studies and presented at PM Pediatrics' national conference, approached Dr. Mahadeo of her own accord, told him that McCaskill had informed her about his research topic and expressed an interest in helping him with his research, as academic research and publications were a way to get promoted within the company.

147.     During conversations about Dr. Mahadeo's research, Dr. Mahadeo informed Dr. Levine about the abuse that he feared his own children had experienced as a result of his divorce

and stated that all of the incidents he had described were summarized in a complaint that he intended to file against Queens County Supreme Court Judge Margaret McGowan ("Judge McGowan") for allegedly mishandling certain aspects of his divorce case. Dr. Levine suggested that Dr. Mahadeo send her a copy of the complaint so that she could analyze it and help Dr. Mahadeo to strategize about what forms of abuse seemed to be present in the context of his own divorce case and provide her thoughts as to what methods could be taken to protect children from similar forms of abuse.

148.    Shortly after Dr. Mahadeo shared his complaint against Judge McGowan with Dr. Levine, Dr. Levine called him and expressed sympathy for what his children had gone through based on the allegations in Dr. Mahadeo's complaint, stating that it sounded to her like the children were experiencing abuse at the hands of their mother and the attorney for the children. During this conversation, Dr. Levine suggested that they start working on the study as soon as possible and try to get it published. Dr. Levine additionally described the research topic as novel and stated that she believed it would be suitable to present at a national conference once the study had been completed.

149.    Although Dr. Levine subsequently forwarded Dr. Mahadeo's complaint against Judge McGowan to others at PM Pediatrics, it is Dr. Mahadeo's belief that Dr. Levine did so as she was hoping to be promoted to one of the regional medical director positions that ultimately went to Drs. Bruckner and Grossman. Dr. Mahadeo is aware based on conversations with Dr. Levine that Dr. Levine was particularly upset that Drs. Bruckner and Grossman were promoted in lieu of her and that she had reached out to Dr. Schor directly to complain about their appointments. Dr. Mahadeo is further aware that Dr. Levine and Dr. Cohen shared a close personal relationship, such that, upon information and belief, she, along with the others mentioned in this complaint, was

possibly asked by upper management to manufacture complaints against Dr. Mahadeo in an effort to terminate him.

150.    At no point did PM Pediatrics share with Dr. Mahadeo that Dr. Levine had forwarded Dr. Mahadeo's complaint or express any concern whatsoever that he had done so.

151.    During Dr. Mahadeo's December 6, 2019 conversation with Dr. Zrake, Dr. Mahadeo informed Dr. Zrake that he had been terminated because "one of the staff was unhappy with [him]." Dr. Zrake responded that "[PM Pediatrics] would never fire somebody if one person is unhappy," adding "I know your staff…everybody likes you. I know every single person. I know Megan, I know Rachael [Fasano]. …I know your Xray tech. I know everybody. Nobody is dissatisfied with you. …I don't know who it could possibly be." Dr. Zrake further expressed confusion as to how Dr. Mahadeo could have had a "great" review in August and [be] terminated by November because one employee said one thing." Dr. Zrake additionally stated that "usually, if somebody has a problem, there's a discussion first." Dr. Mahadeo informed Dr. Zrake that PM Pediatrics had given him a letter of good standing stating that I provided excellent clinical care to patients, to which Dr. Zrake responded, "how would you write a letter like that and then just say it was a problem with an employee?"

152.    During Dr. Mahadeo's December 6, 2019 conversation with Dr. Zrake, he informed Dr. Zrake that he suspected that he was going to be terminated because the company had started to "make a lot of comments about age." Specifically, Dr. Mahadeo informed Dr. Zrake that Dr. Cohen had declined his request to be the medical director for the Bellerose site during a meeting with McCaskill because the company wants to hire "younger people." Dr. Mahadeo further stated that his termination was "clearly age discrimination," because "everybody likes me." Dr. Zrake agreed that "everybody liked you. Megan liked you. Everybody liked you.…You're nice to

everybody. You usually say, 'no problem.' Everything is cool." Dr. Zrake further stated that she has been to the Carle Place Location "many times, and they always speak highly of you. …You get along with everybody."

153.    During Dr. Mahadeo's December 6, 2019 conversation with Dr. Zrake, Dr. Mahadeo informed Dr. Mahadeo informed Dr. Zrake that on Halloween 2019 and during a medical assistant's birthday very shortly before my termination, on November 3, 2019, he took pictures with his staff during office celebrations. Dr. Zrake acknowledged that she had seen some of the photographs and that she "can't imagine" why Dr. Mahadeo would have been terminated, as "everybody always speaks highly of you when I'm there. They were very happy when you became medical director. Everybody liked you."

154.    During Dr. Mahadeo's December 6, 2019 conversation with Dr. Zrake, Dr. Mahadeo informed Dr. Zrake that he had asked Dr. Cohen directly if he could be the medical director of the Bellerose site, which she declined, stating that the company "wants younger people." Dr. Mahadeo informed Dr. Zrake that he had explained to Dr. Cohen that he "know[s] the community well" and "know[s] all the business leads" and stated that he believed that "[he] could make that site thrive." Dr. Zrake stated that she believed that he could, as she "remember[ed] how much your patients loved you. You would make that place really thrive."

155.    During Dr. Mahadeo's December 6, 2019 conversation with Dr. Zrake, Dr. Mahadeo informed Dr. Zrake that he believed the company was pressuring Dr. Levine to leave PM Pediatrics due to her age. Dr. Mahadeo further informed the physician that he believed Dr. Cohen was favoring Jewish employees, referencing Siegel's ten thousand-dollar ($10,000.00) bonus and raise. Although Dr. Zrake stated that she was not familiar with Siegel professionally, she agreed with me that a medical doctor should receive a higher bonus and raise than a nurse

36

practitioner. Dr. Mahadeo further stated that he believed that Drs. Bruckner and Henning were receiving favorable treatment because they are Jewish.

156.    During Dr. Mahadeo's December 6, 2019 conversation with Dr. Zrake, Dr. Mahadeo explained to Dr. Zrake that Fasano had filed a complaint against him because he told her that she should not transfer patients to other facilities without consulting with the provider on duty. Dr. Mahadeo further stated that he believed the company was encouraging Fasano to complain about me in the same way that Dr. Bruckner had instructed Dr. Elbedewy to file a complaint, because PM Pediatrics was trying to "build a case" against him. Dr. Mahadeo stated to Dr. Zrake that he felt it was strange that Fasano would have filed a complaint, as she "liked me a lot. She used to bring food all the time." Dr. Zrake agreed that "Rachael always liked [Dr. Mahadeo]"

157.    Dr. Mahadeo worked at Carle Place on numerous occasions when Dr. Zrake was on duty, such that Dr. Zrake frequently observed his interactions with his staff. Dr. Zrake also had numerous discussions with Dr. Mahadeo's staff about his job performance.

158.    Dr. Mahadeo was an extremely hardworking employee who routinely saw far more patients than others on the site (i.e., up to two-thirds to three-quarters of the patients at Carle Place and as many as seventy [70] patients per shift, or ten [10] patients per hour), including younger staff.[1] Indeed, patients frequently called specifically to see me. Notably, despite Dr. Mahadeo's high workload, he never had a malpractice claim filed against him.

159.    As mentioned above, Dr. Mahadeo's July 2019 annual review was overwhelmingly positive. Specifically, the review stated that:

- "[H]e is very well-rounded with knowledge. If we ever have questions regarding medicine/procedure, he takes the time to explain them, especially those of us who are interested in expanding our roles in the medical field…;"

_____

[1] In response to questions from staff seeking her opinion as to an acceptable number of patients to see in an hour, Dr. Cohen responded that three to four (3-4) patients was reasonable.

- "Dr. Mahadeo is calm and pleasant, regardless of what is going on in his personal life. He is always on time and responds to my emails, texts and calls quickly even when it's not a convenient time for him. I feel comfortable going to him with any concerns and my staff has expressed to me that they do as well. He genuinely cares and wants us all to grow and make this an enjoyable environment for everyone to work in;"

- "His overall demeanor is very professional and he makes you feel comfortable when you need to approach him regarding any matters/issues. He is always punctual and always willing to help out when needed;"

- "The staff has come to learn that they can go to him with anything from a customer issue, to a scheduling conflict, to building issues, because we are a team. He helps with meds, steps, etc. If we are short a nurse or X-ray tech, he will jump in to help at any time;"

- "Dr. Mahadeo is a great team player. He is always a pleasure to work with. He communicates with staff both professionally and accordingly;"

- "The way he oversees this office is very well organized, and he always makes sure his staff is happy and comfortable. If there is an issue, he addresses it accordingly and foresees ways to make sure it doesn't happen again. He ensures a good work environment. His presence in this office is overall professional, optimistic and calm. When it comes to feedback, he is very approachable and courteous;"

- "He has built a cohesive and successful team with the help of his new OM, Megan. He is well respected by his staff and liked by his patients."

160.    Dr. Mahadeo's July 2019 review additionally stated that there were no areas in which he could improve as of the date of the review ("Areas for improvement: …None at this time.").

161.    After Dr. Mahadeo's performance review, Dr. Cohen sent Dr. Mahadeo a message apologizing for any confusion about whether his sign-on bonus would be counted as his annual bonus for July 2018 through June 2019 and stating that "you will be receiving your *well deserved* $12k raise in your next paycheck." (emphasis added).

162.    Indeed, Dr. Mahadeo's performance was so highly regarded within the company that he received a letter from PM Pediatrics after his termination, on or about November 27, 2019, stating that "Dr. Mahadeo provided strong clinical care to our patients and left PM Pediatrics in

good standing."

163.    On or about January 21, 2020, Dr. Mahadeo additionally received a recommendation letter from Dr. Cohen stating that he is a "compassionate physician with excellent clinical decisionmaking skills. He is well liked by patients and families and ensured that his patients experienced a high level of service."

164.    From September 2019 through as late as November 2019, the month that Dr. Mahadeo was terminated, McCaskill spoke very highly about Dr. Mahadeo to Gokool and Bridgemohan when they first started working at PM Pediatrics, stating that she (McCaskill) was much happier working with Dr. Mahadeo compared to previous medical directors, referring to Dr. Mahadeo as the "best medical director" who was a "pleasure to work with" and describing him to Gokool and Bridgemohan as "hardworking," and well-liked by patients and staff.

165.    Further, in the October 16, 2019 recording of Dr. Mahadeo's conversation with Dr. Patankar, Dr. Patankar stated, "I always talk about you to Allah [Shenkman], Sheryl [Cohen] and Rich [Bruckner.] I will always make a comment on e-mails to Sheryl that Robby has been amazing. I feel so blessed to have Robby to lean on." Dr. Patankar additionally stated that Dr. Mahadeo "reaches out every day" to see if Dr. Patankar needs anything or if there is anything he can cover." During that conversation, Dr. Mahadeo asked Dr. Patankar whether she would agree that Dr. Mahadeo's staff speaks "well" about him, to which Dr. Patankar responded that "everyone" would, including McCaskill.

166.    Although Dr. Mahadeo learned during a quarterly medical director meeting in or around September 2019 that PM Pediatrics planned to slow the opening of new sites, it is Dr. Mahadeo's understanding that the reason for this was that PM Pediatrics had simply been expanding too quickly, such that they were opening sites too close to each other and effectively

competing against themselves. During this meeting, Dr. Schor plainly stated that everyone's job was safe. Indeed, Carle Place was a particularly high-performing site that routinely placed in the top ten percent (10%) in the country in terms of income generated from patients and saw a large volume of patients at all times, such that it is clear that Dr. Mahadeo's termination was not due to financial reasons. Moreover, Dr. Mahadeo is not aware of any other medical directors or upper management employees who were recently terminated.

**Dr. Mahadeo Has Been Significantly Damaged By PM Pediatrics' Abrupt Termination of His Employment**

167.    Although PM Pediatrics presented Dr. Mahadeo with a Separation and Release of Claims after his termination, stating that he waives and releases any and all claims he may have against PM Pediatrics, Dr. Mahadeo never signed this agreement and, in fact, informed the company in a January 15, 2020 e-mail that he did not plan to sign, as his divorce attorney had advised him that it could adversely affect his case.

168.    Although Dr. Mahadeo received twelve (12) weeks' severance pay pursuant to Section 4(b) of his employment agreement ("Either party may terminate your employment at any time and for any reason or no reason within three [3] months prior written notice to the other party…If termination is initiated by the Company under this Section and you are required to cease providing services to the Company and to vacate the Office prior to the end of the three-month notice period…the Company will make severance payments as and when equal to the compensation you would have received…throughout such three-month notice period."), he has been so substantially injured by his termination and various demands made of me by the company while still employed at PM Pediatrics that the three (3) months of severance he received is insufficient.

169.    As Dr. Mahadeo declined an offer from GoHealth, PM Pediatrics' major

competitor, in order to work for PM Pediatrics, he has struggled to find steady work since his termination in November 2019.

170.    Although Dr. Mahadeo maintains a private medical practice, the practice has been significantly damaged, as Dr. Cohen's irregular scheduling prohibited him from setting a regular schedule to see patients. Throughout the Mahadeo Employment Period, Dr. Cohen specifically informed Dr. Mahadeo that he could not get any specific days off to run his practice.

171.    In or around September 2018, Dr. Cohen additionally instructed Dr. Mahadeo to send all of his patients from his private practice to PM Pediatrics. Indeed, Dr. Mahadeo sent hundreds of patients over the course of his employment period. Further, Dr. Mahadeo's practice has been closed since on or about March 14, 2020 due to the COVID-19 national health emergency.

**FIRST CAUSE OF ACTION**
**Title VII of the Civil Rights Act**
**(Race, Color, National Origin and Religious Discrimination)**

172.    Plaintiff Mahadeo repeats and re-alleges each and every allegation contained in the preceding paragraphs with the same force and effect as though fully set forth herein.

173.    Defendants PM Pediatrics of Selden, PLLC and PM Pediatrics Management Group, LLC were employers within the meaning of Title VII.

174.    By the acts and practices described above, including but not limited to denying Dr. Mahadeo two (2) promotions and ultimately terminating his employment, Defendants discriminated against Plaintiff Mahadeo in violation of Title VII.

175.    Plaintiff Mahadeo is a brown-complexioned Guyanese male who practices Hinduism. Throughout his employment with Defendants, Dr. Mahadeo was denied promotions and ultimately targeted for termination and subjected to the disparate treatment described above due to his race, color, national origin and religion. Dr. Mahadeo is also aware that PM Pediatrics

upper management staff terminated or mistreated several other minority employees, including making numerous derogatory comments about them, and expressed a strong preference for Jewish and/or Caucasian employees.

176.    As a result of Defendants' discrimination, Plaintiff Mahadeo is now suffering and will continue to suffer irreparable mental injuries, humiliation and mental anguish and economic and non-economic damages because of the discriminatory conduct of Defendants.

**SECOND CAUSE OF ACTION**
**AGE DISCRIMINATION IN EMPLOYMENT ACT**

177.    Plaintiff repeats and re-alleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

178.    Plaintiff was within the protected age group under the ADEA as he was fifty-five (55) years old when he experienced the discriminatory acts (e.g., denial of two (2) promotions and termination of his employment) described in the preceding paragraphs.

179.    Plaintiff was well-qualified for his position, as well as the Bellerose medical director and regional medical director positions, as he had been practicing medicine since 1990, had significantly more experience than Drs. Grossman, Bruckner and Elbedewy and was double-board certified physician in pediatrics and pediatric emergency medicine.

180.    Plaintiff suffered adverse employment actions of failure to promote and termination due to his age.

181.    Plaintiff's age gives rise to an inference of discrimination given the derogatory comments made by those in upper management, including stating that certain employees were "too old" to be promoted, that their careers were over due to their age, that they were "over the hill," that they needed to resign and that the "company wants younger people."

182.    Plaintiff's age was the "but for" cause of discrimination due to specific due to specific comments made with respect to Plaintiff that "the company wants younger people."

183.    As a result of the unlawful discrimination by Defendants, Plaintiff has suffered substantial money damages, including but not limited to, loss of wages, loss of future earnings and appreciation thereon.

184.    In addition, as a result of the willful and unlawful discrimination by Defendants, Plaintiff has suffered severe humiliation and mental anguish, psychological, and emotional damages.

185.    As a result of the foregoing actions by Defendants, Plaintiff has been damaged to his person, property and employment.

186.    As a result of the foregoing, Plaintiff is entitled to backpay with interest, front pay and compensatory damages and liquidated/punitive damages, in an amount to be proved at trial.

**THIRD CAUSE OF ACTION**
**NEW YORK STATE HUMAN RIGHTS LAW**
**(Race, Color, National Origin and Religious Discrimination)**

187.    Plaintiff Mahadeo repeats and re-alleges each and every allegation contained in the preceding paragraphs with the same force and effect as though fully set forth herein.

188.    Defendants were employers of Plaintiff within the meaning of NYSHRL.

189.    By the acts and practices described above, including but not limited to terminating and making numerous derogatory comments about minority employees, refusing to promote Dr. Mahadeo on two (2) occasions and ultimately terminating his employment, Defendants discriminated against Dr. Mahadeo in violation of the NYSHRL.

190.    Plaintiff Mahadeo is a brown-complexioned Guyanese male who practices Hinduism. As described herein, Plaintiff Mahadeo is aware that Dr. Cohen and others at PM

Pediatrics used derogatory language to speak about minority employees, terminated several minority employees and expressed their preference for Jewish and Caucasian employees.

**FOURTH CAUSE OF ACTION**
**<u>NEW YORK STATE HUMAN RIGHTS LAW – AGE DISCRIMINATION</u>**

191.    Plaintiff Mahadeo repeats and re-alleges each and every allegation contained in the preceding paragraphs with the same force and effect as though fully set forth herein.

192.    By the actions detailed above, Defendants unlawful discriminated against Plaintiff on the basis of his age in violation of the NYSHRL.

193.    As a result of the unlawful discrimination by Defendant, Plaintiff has suffered substantial money damages, including but not limited to, loss of wages, loss of future earnings and appreciation thereon.

194.    In addition, as a result of the willful and unlawful discrimination by Defendants, Plaintiff has suffered severe humiliation and mental anguish, psychological, physical and emotional damages.

195.    As a result of the foregoing actions by the Defendants, Plaintiff has been damaged to his person, property and employment.

196.    As a result of the foregoing, Plaintiff is entitled to backpay with interest, front pay, compensatory damages and liquidated/punitive damages, in an amount to be proved at trial.

**<u>PRAYER FOR RELIEF</u>**

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.      An order tolling the statute of limitations;

b.      A declaratory judgment that the practices complained of herein are unlawful under Title VII, ADEA and NYSHRL;

c.      An injunction against Defendant and its officers, agents, successors, employees,

44

representatives and any and all persons acting in concert with Defendant, as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

d.  An award of compensatory damages as a result of Defendants' unlawful discrimination pursuant to Title VII, ADEA, NYSDHR and supporting regulations;

e.  An award of liquidated and/or punitive damages as a result of Defendants' unlawful discrimination pursuant to Title VII, ADEA, NYSDHR and supporting regulations;

f.  An award of compensatory damages in an amount to be shown at trial for past and future economic and non-economic losses, including lost wages, future lost wages, pain and suffering, emotional distress and mental anguish;

g.  An award for exemplary and/or punitive damages in an amount to be shown at trial as a result of Defendants' willful and malicious discriminatory and illegal conduct;

h.  An award of prejudgment and post-judgment interest;

i.  An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

j.  Such other and further relief as this Court deems just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by the complaint.

Dated: New York, New York
      September 10, 2021

                              Respectfully submitted,

                              **PELTON GRAHAM LLC**

                              By: _____

                              Brent E. Pelton
                              pelton@peltongraham.com
                              Taylor B. Graham
                              graham@peltongraham.com
                              Kristen E. Boysen
                              boysen@peltongraham.com
                              111 Broadway, Suite 1503
                              New York, New York 10006
                              Telephone: (212) 385-9700
                              Facsimile: (212) 385-0800

                              *Attorneys for Plaintiff*

# EXHIBIT A



# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## New York District Office

33 Whitehall Street, 5th Floor
New York, NY  10004-2112
Intake Information Group:  (800) 669-4000
Intake Information Group TTY:  (800) 669-6820
New York Direct Dial:  (929) 506-5384
FAX (929) 506-5270
Website:  www.eeoc.gov

Our Reference:      Robby Mahadeo v. PM PEDIATRICS OF SELDEN, PLLC
                    EEOC # 520-2020-05384

Robby Mahadeo
C/o: Kristen E. Boysen, Esq.
PELTON GRAHAM LLC
111 Broadway, Suite 1503
New York, NY 10006

Dear Mr. Mahadeo,

This is with reference to your correspondence and subsequent communication with this office in which you alleged discrimination in violation of the Age Discrimination in Employment Act of 1967 as amended, and Title VII of the Civil Rights Act of 1964, as amended by the above-named Respondent.

A review of all available information provided failed to indicate that a violation of the statute(s) has occurred; however, this does not certify that Respondent is in compliance with the statutes. While we fully understand that the parties to a charge often have very firm views that the evidence supports their respective positions, our final determinations must comport with our interpretations of the available evidence and the laws we enforce. For this reason, we will issue you a Dismissal and Notice of Rights, which will enable you to file suit in U.S. District Court within 90 days of your receipt of that Notice if you wish to pursue this matter further.

We regret that we could not be of further service to you in this matter.

Sincerely,

6/15/2021                               L. Lockett
_____          _____
Date                                    Investigator

cc. Attorney for Charging Party.

EEOC Form 161 (11/2020)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: **Robby Mahadeo**
**198-53 Pompeii Ave.**
**Hollis, NY 11423**

From: **New York District Office**
**33 Whitehall Street**
**5th Floor**
**New York, NY 10004**

[ ]   *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2020-05384** | **Loresa A. Lockett,** Investigator | **(929) 506-5287** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ]  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X]  The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

[ ]  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]  Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

Enclosures(s)

**Judy A. Keenan,**
**District Director**

*(Date Issued)*

cc:   **Craig Bloom**
**Senior Legal Counsel & Compliance Officer**
**PM PEDIATRICS MANAGEMENT GROUP, LLC**
**One Hollow Lane,**
**Suite 301**
**Lake Success, NY 11042**

**Kristen E. Boysen, Esq.**
**PELTON GRAHAM LLC**
**111 Broadway, Suite 1503**
**New York, NY 10006**

Enclosure with EEOC
Form 161 (11/2020)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),
the Genetic Information Nondiscrimination Act (GINA), or the Age
Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within
90 days** of the date you *receive* this Notice.  Therefore, you should **keep a record of this date**.  Once this 90-
day period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to
consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice, and its envelope or
record of receipt, and tell him or her the date you received it.  Furthermore, in order to avoid any question that you
did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was
*issued* to you** (as indicated where the Notice is signed) or the date of the postmark or record of receipt, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate
State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide
after talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short
statement of the facts of your case which shows that you are entitled to relief.  Your suit may include any matter
alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in
the charge.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some
cases can be brought where relevant employment records are kept, where the employment would have been, or
where the respondent has its main office.  If you have simple questions, you usually can get answers from the
office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or
make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back
pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible.  For
example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit
before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA
suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.
Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA
claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction
in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be
made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your
efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above,
because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any
questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need to
inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide
your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files
are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge
file, **please make your review request within 6 months** of this Notice.  (Before filing suit, any request should be
made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

Enclosures(s)

cc:     **Raymond J. Berti**
        **AKERMAN LLP**
        **520 Madison Avenue, 20th Floor**
        **New York, NY 10022**